**FILED**

UNITED STATES DISTRICT COURT
for the
DISTRICT OF COLUMBIA

**FEB 1 3 2002**

~~NANCY MAYER-WHITTINGTON, CLERK~~
~~U.S. DISTRICT COURT~~

------------------------------------x
SECURITIES AND EXCHANGE COMMISSION :
450 Fifth Street, NW
Washington, DC 20549,                :

           Plaintiff,      :

   v.                               :

NUNZIO DeSANTIS and                  :
INTERNATIONAL THOROUGHBRED
BREEDERS, INC.,                      :

           Defendants.     :

                     :
------------------------------------x

CASE NUMBER  1:02CV00282

JUDGE: Emmet G. Sullivan

DECK TYPE: General Civil

DATE STAMP: 02/13/2002

### COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

### NATURE OF THE CASE

1.   The SEC brings this action against Nunzio DeSantis ("DeSantis") for violations of the federal securities laws while an officer and director of two publicly traded companies, International Thoroughbred Breeders, Inc. ("ITB") and AutoLend Group, Inc. ("AutoLend").  DeSantis aided and abetted ITB's failure to disclose and properly account for certain related party transactions in its Forms 10-Q for the quarters ended December 31, 1996 and March 31, 1997.  With respect to AutoLend, DeSantis engaged in a scheme to defraud the

holders of AutoLend's 9.5% convertible subordinated debentures ("the Bonds") during a self tender offer made on October 22, 1996 to the AutoLend bondholders. DeSantis also aided and abetted AutoLend's failure to disclose related party transactions in the company's December 31, 1996 Form 10-Q and in its March 31, 1997 Form 10-K.

## JURISDICTION

2.   This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. § 78u(e) and 78aa]. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce and/or of the mails in connection with the transactions described in this Complaint.

## DEFENDANTS AND RELATED ENTITY

3.   Defendant **Nunzio DeSantis** ("DeSantis") was a board member and chief executive officer of International Thoroughbred Breeders, Inc. ("ITB") at all relevant times. DeSantis was also chairman of the board, president and chief executive officer of AutoLend Group, Inc. at all relevant times. DeSantis resigned from ITB in January 1999, and resigned as a director of AutoLend in May 2000 and as an employee and officer in September 2000. DeSantis lives in Albuquerque, New Mexico.

4.   Defendant **International Thoroughbred Breeders, Inc.** ("ITB" or the "company") is a Delaware corporation

2

headquartered in New Jersey.  During the relevant period, ITB owned and operated two racetracks in New Jersey.  ITB's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 781(b)] and was traded on the American Stock Exchange until August 1998, when it was delisted.  During the relevant period, ITB filed periodic reports with the SEC pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)].  ITB's fiscal year ends June 30.

5.  **AutoLend Group, Inc.** (AutoLend") is a publicly traded Delaware corporation located in Albuquerque, New Mexico.  AutoLend was listed in the Nasdaq Small Capital Market until May 21, 1996 and the Boston Stock Exchange until August 20, 1996.  AutoLend currently trades on the pink sheets.

### SUBSTANTIVE ALLEGATIONS CONCERNING INTERNATIONAL THOROUGHBRED BREEDERS, INC.

**ITB's December 31, 1996 Form 10-Q**

6.  Immediately after taking control of ITB in January 1997, DeSantis caused the company to issue a $150,000 check to Autolend, which was then experiencing financial difficulties.  The purpose of this payment was purportedly to reimburse Autolend for financing charges incurred on ITB's behalf in December 1996.

7.  On February 15, 1997, ITB filed with the SEC its Form 10-Q for the quarter ended December 31, 1996.  In the

financial statements contained in the December 31 Form 10-Q, ITB failed to record an expense for the $150,00 Autolend payment, as required by generally accepted accounting principles.  As a result, ITB's loss for the quarter was materially understated by $150,000 or approximately 5 percent.  The December 31 Form 10-Q also failed to disclose the related-party nature of the Autolend payment, as required by Item 404 of Regulation S-K [17 C.F.R. § 229.404].

8.   ITB knew, or was reckless in not knowing, that the December 31 Form 10-Q failed to disclose and properly account for the Autolend payment and that, as a result, the December 31 Form 10-Q was materially false and misleading. DeSantis knowingly provided substantial assistance to those disclosure and accounting failures.

**ITB's March 31, 1997 Form 10-Q**

9.   In February 1997, DeSantis caused the company to begin paying salaries and operating expenses for Southwest Jet.  A corporate airline charter service, Southwest Jet had no assets of its own and operated an airplane partially owned by DeSantis.  DeSantis' twenty-three year old son operated Southwest Jet.  Around the same time, DeSantis placed his personal cook on the ITB payroll.  As of March 31, 1997, ITB's payments on behalf of Southwest Jet and DeSantis' cook totaled approximately $160,000.

10.   On May 20, 1997, ITB filed with the SEC its Form 10-Q for the quarter ended March 31, 1997.   In the financial statements contained in the March 31 Form 10-Q, ITB failed to disclose the related-party nature of its payments on behalf of Southwest Jet and DeSantis' cook, as required by Item 404 of Regulation S-K [17 C.F.R. § 229.404].   These payments were instead recorded as part of general and administrative expenses.

11.   The approximately $160,000 ITB paid on behalf of Southwest Jet and DeSantis' cook as of March 31, 1997, constituted approximately 10 percent of ITB's net loss for the quarter and contributed to a cash-flow crisis.

12.   ITB knew, or was reckless in not knowing, that the March 31 Form 10-Q failed to disclose the company's payments on behalf of Southwest Jet and DeSantis' cook and that, as a result, the March 31 Form 10-Q was materially false and misleading.   DeSantis knowingly provided substantial assistance to that disclosure failure.

13.   In 1999, DeSantis repaid the personal expenses described above when he sold his personal holding in ITB stock back to the company.

### SUBSTANTIVE ALLEGATIONS CONCERNING AUTOLEND GROUP, INC.

**Background**

14.   In 1991, AutoLend's predecessor, CAPX, raised approximately $51.4 million through the offer and sale of

the Bonds to European investors for the stated purpose of purchasing viatical settlement portfolios. The Bonds were not registered with the Commission, were sold only in Europe, and matured on September 19, 1997.

15. In March 1994, CAPX established AutoLend as a consumer finance company and a subsidiary of CAPX. In July 1994, CAPX sold most of its viatical settlement business and in February 1995, changed its name to AutoLend.

16. During 1994 and 1995, AutoLend suffered financial difficulties but continued to timely service the Bonds.

17. In December 1995, DeSantis and others filed a shareholders derivative suit against AutoLend's Chief Executive Officer and others. On September 18, 1996, as part of a settlement of that suit, DeSantis became AutoLend's president and chairman of the board.

18. By September 1996, AutoLend had sold all of its viatical settlement business and other operations and had no ongoing operations. AutoLend was collecting account receivables held from previous operations and had amassed cash of approximately $13 million. AutoLend was seeking to acquire an ongoing business. In addition, AutoLend had obligations of approximately $21 million of outstanding Bonds.

19. To preserve AutoLend's available cash to finance an acquisition, AutoLend withheld the September 1996

interest payment on the Bonds, despite having sufficient cash available to make the payment.

20. To further preserve funds, DeSantis then caused AutoLend to make a self tender offer. On October 22, 1996, AutoLend, through DeSantis, filed with the Commission a Schedule 13E-4, Issuer Tender Offer Statement ("Schedule 13E-4"), which proposed an exchange of the Bonds for a package of AutoLend's low valued common stock and newly issued preferred stock ("the Exchange Offer") in AutoLend.

21. The stated purpose of the Exchange Offer was to acquire an ongoing revenue generating business operation.

22. By signing the Schedule 13E-4 and its amendments, DeSantis certified that the information in the filings was true, correct, and complete.

23. On November 1, 1996, DeSantis' plan for AutoLend to acquire an ongoing business was interrupted when four bondholders ("the Petitioning Bondholders") filed an involuntary bankruptcy petition against AutoLend. The Petitioning Bondholders held approximately $6,600,000 of Bonds and had demanded cash of approximately 75% of face value for their Bonds instead of accepting the terms of the Exchange Offer.

24. Because of the involuntary bankruptcy, DeSantis caused AutoLend to file several amendments to the tender offer to extend the date on which the Exchange Offer

expired or closed.   The tender offer, as amended, closed on
April 8, 1997.

25.   At or before the time the bankruptcy proceeding
was filed, DeSantis had identified a business that he
wanted AutoLend to acquire by using its cash assets.

**Failure To Disclose Improper Negotiations With Bondholders
And The Sham Purchases Of Certain Bonds**

26.   While the Exchange Offer was pending, AutoLend's
executive vice president and treasurer, at DeSantis'
direction, contacted bondholders who had not accepted the
Exchange Offer to determine at what price, if any, they
would be willing to sell their Bonds for cash.

27.   DeSantis and AutoLend failed to disclose in the
initial Exchange Offer filing or any of its amendments the
above-described efforts it made to arrange to purchase
Bonds for cash rather than on the terms set forth in the
Exchange Offer.

28.   On January 8, 1997, the Petitioning Bondholders
learned from AutoLend's counsel that DeSantis intended to
use AutoLend's cash to fund the purchase of the targeted
business and on January 13, 1997, the Petitioning
Bondholders obtained a Temporary Restraining Order ("TRO")
from the bankruptcy court prohibiting AutoLend from using
any of its cash in connection with any such purchase.

29.   After the TRO was entered, DeSantis learned from
the Petitioning Bondholders that they would consider

dismissing the bankruptcy if an independent third party purchased their Bonds.

30.   Thereafter, DeSantis took action to get the involuntary bankruptcy dismissed by arranging a sham sale of the Petitioning Bondholders' Bonds.

31.   DeSantis asked an investment banker to find a "buyer" for the Petitioning Bondholders' Bonds, with the understanding that AutoLend would purchase the buyer's position in the Bonds at a premium after the Exchange Offer closed and the involuntary bankruptcy was dismissed.

32.   DeSantis and AutoLend failed to disclose to the Petitioning Bondholders and others that the third party buyer was merely a straw man and that the transaction was, therefore, a sham.

33.   The third party purchase was a sham because of two other undisclosed agreements that DeSantis caused AutoLend to enter, referred to as the secret agreement and the Tripartite Agreement.

34.   The secret agreement that DeSantis had with the investment banker and, possibly, the purchaser ("the Purchaser") was that AutoLend would purchase the Bonds from the Purchaser after the Exchange Offer closed and the bankruptcy was dismissed but before maturity, at a premium over the purchase price.   This secret agreement created a nearly risk-free transaction for the Purchaser.

35.   On February 24, 1997, the Purchaser, AutoLend and
the investment banker entered the Tripartite Agreement,
which, on its face, obligated the investment banker to
purchase the Bonds from the Purchaser at a set price plus
an escalating premium determined by the period of time that
the Purchaser held the Bonds or pay liquidated damages of
$750,000.   Although the Tripartite Agreement obligated the
investment banker to purchase the Bonds, each of the
parties to the Tripartite Agreement understood that
AutoLend was the party who would purchase the Bonds from
the Purchaser after the bankruptcy was dismissed and the
Exchange Offer closed.

36.   Furthermore, the Tripartite Agreement also
obligated AutoLend to, among other things, maintain cash
and cash equivalents of no less than $11 million for as
long as the Purchaser owned the Bonds, which effectively
prohibited AutoLend from acquiring any ongoing business as
long as the Purchaser owned the Bonds.

37.   In furtherance of the secret agreement with the
investment banker, DeSantis executed for its benefit a
letter of indemnification from loss resulting from the
Tripartite Agreement.   The indemnification agreement
acknowledged that DeSantis executed it in consideration of
the investment banker's executing and delivering the
Tripartite Agreement to the Purchaser.

38.   DeSantis and AutoLend failed to amend the Exchange Offer materials to disclose either the secret or the Tripartite Agreement.

39.   The sale of the Bonds led to the dismissal of the involuntary bankruptcy on April 18, 1997.

40.   On April 8, 1997, the Exchange Offer closed and several bondholders tendered approximately $7.6 million of Bonds for exchange.

41.   On July 10, 1997, in accordance with the Tripartite Agreement, AutoLend purchased the Petitioning Bondholder's Bonds from the Purchaser for $4.95 million ($4.65 million purchase price plus a $300,000 premium).

42.   AutoLend and DeSantis knew, or were reckless in not knowing, of the activities described in Paragraphs 1 through 41 above.

**Failure To Disclose Related Party Transactions**

43.   From October 1996 through January 1997, DeSantis caused AutoLend to engage in undisclosed related party transactions.

44.   In the fiscal year ended March 1997, DeSantis caused AutoLend to pay certain personal expenses of DeSantis that exceeded, in January 1997, $60,000.  DeSantis caused AutoLend to fail to disclose these expenses after they exceeded $60,000 for the fiscal year in its annual report (Form 10-K) for the period ended March 31, 1996, as

11

required by Item 404 of Regulation S-K [17 C.F.R. §
229.404].

45.  In the fiscal year ended March 1997, DeSantis
also caused AutoLend to pay certain unrelated business
expenses of a company owned by DeSantis that exceeded, in
December 1996, $60,000.  DeSantis caused AutoLend to fail
to disclose these expenses after they exceeded $60,000 for
the fiscal year in its quarterly report (Form 10-Q) for the
period ended December 31, 1996 and annual report (Form 10-
K) for the period ended March 31, 1997, as required by Item
404 of Regulation S-K [17 C.F.R. § 229.404].

46.  DeSantis signed the Form 10-K and Form 10-Q
described above.

47.  AutoLend and DeSantis knew, or were reckless in
not knowing, of the activities described in Paragraphs 1
through 46 above.

### FIRST CLAIM FOR RELIEF

**(against DeSantis and ITB for Violations
of Section 10(b) and Rule 10b-5
of the Exchange Act)**

48.  Plaintiff SEC hereby incorporates paragraphs 1
through 47 with the same force and effect as if set out
here.

49.  In the manner described in paragraphs 1 through
48, DeSantis, in connection with the purchase and sale of
the Bonds described above, by the use of the means and

instrumentalities of interstate commerce and of the mails,
directly or indirectly, employed devices, schemes and
artifices to defraud; made untrue statements of material
fact or omitted to state material facts necessary in order
to make the statements made, in light of the circumstances
under which they were made, not misleading; or engaged in
acts, practices and courses of business which operated as a
fraud and deceit upon purchasers and sellers of the Bonds,
in violation of Section 10(b) of the Exchange Act [15
U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17
C.F.R. §240.10b-5].

50.   In the manner described in paragraphs 1 through
49, ITB, in connection with the purchase or sale of
securities, by the use of means or instrumentalities of
interstate commerce or of the mails, directly or indirectly
(a) employed devices, schemes or artifices to defraud; (b)
made untrue statements of material facts or omitted to
state material facts necessary in order to make the
statements made, in light of the circumstances under which
they were made, not misleading; or (c) engaged in acts,
practices or courses of business which operated or would
operate as a fraud or deceit upon persons, in violation of
Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and
Rule 10b-5 promulgated there under [17 C.F.R. § 240.10b-5],
and DeSantis aided and abetted ITB's primary violations
pursuant to Section 20(e) of the Exchange Act [15 U.S.C.

Section 78t(e)] by knowingly providing substantial assistance thereto.

### SECOND CLAIM FOR RELIEF

**(against ITB and DeSantis for Violations
of Sections 13(a) and Rules 12b-20, 13a-1
and 13a-13 of the Exchange Act)**

51.   Plaintiff SEC hereby incorporates paragraphs 1 through 50 with the same force and effect as if set out here.

52.   In the manner described in paragraphs 1 through 51, ITB filed with the SEC materially false and misleading Forms 10-Q for the quarters ended December 31, 1996, and March 31, 1997, in violation of Sections 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 promulgated thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-13], and DeSantis aided and abetted ITB's primary violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. Section 78t(e)] by knowingly providing substantial assistance thereto.

53.   In the manner described in paragraphs 1 through 52, AutoLend filed with the SEC a materially false and misleading Form 10-K for the year ending March 31, 1997 and a materially false and misleading Form 10-Q for the quarter ended December 31, 1996, in violation of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 13a-1 and 13a-13 [17 C.F.R. §§240.13a-1 and 240.13a-13] promulgated

thereunder, and DeSantis aided and abetted AutoLend's
primary violations pursuant to Section 20(e) of the
Exchange Act [15 U.S.C. Section 78t(e)] by knowingly
providing substantial assistance thereto.

### THIRD CLAIM FOR RELIEF

**(against ITB and DeSantis for Violations
of Sections 13(b)(2)(A) and 13(b)(2)(B)
of the Exchange Act)**

54.   Plaintiff SEC hereby incorporates paragraphs 1
through 53 with the same force and effect as if set out
here.

55.   In the manner described in paragraphs 1 through
54, ITB (a) failed to make and keep books, records and
accounts, which, in reasonable detail, accurately and
fairly reflect the transactions and dispositions of the
assets of the company, and (b) failed to devise and
maintain a system of internal accounting controls
sufficient to provide reasonable assurances that (i)
transactions were executed in accordance with management's
general or specific authorization, (ii) transactions are
recorded as necessary to permit preparation of financial
statements in conformity with generally accepted accounting
principles or any other criteria applicable to such
statements and to maintain accountability for assets, (iii)
access to assets is permitted only in accordance with
management's general or specific authorization, and (iv)
the recorded accountability for assets is compared with the

existing assets at reasonable intervals and appropriate
action is taken with respect to any differences, in
violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the
Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)],
and DeSantis aided and abetted ITB's primary violation of
Section 13(b)(2)(A) pursuant to Section 20(e) of the
Exchange Act [15 U.S.C. section 78t(e)] by knowingly
providing substantial assistance thereto.

### FOURTH CLAIM FOR RELIEF

#### (against DeSantis for Violations
of Rule 10b-13 of the Exchange Act
of the Exchange Act)

56.   Plaintiff SEC hereby incorporates paragraphs 1
through 55 with the same force and effect as if set out
here.

57.   In the manner described in paragraphs 1 through
56, DeSantis caused AutoLend to make an exchange offer for
the Bonds described above and, directly or indirectly,
purchased or made an arrangement to purchase the Bonds,
otherwise than pursuant to the exchange offer from the time
such exchange offer was publicly announced or otherwise
made known by DeSantis to the bondholders until the
expiration of the period, including any extensions thereof,
during which the Bonds tendered pursuant to such exchange
offer may have by the terms of such offer been accepted or

rejected, in violation of Rule 10b-13 of the Exchange Act
[17 C.F.R. §240.10b-13].[1]

### FIFTH CLAIM FOR RELIEF

#### (against DeSantis for Aiding and Abetting
Violations of Section 14(e)
of the Exchange Act)

58.   Plaintiff SEC hereby incorporates paragraphs 1
through 57 with the same force and effect as if set out
here.

59.   In the manner described in paragraphs 1 through
58, AutoLend, in connection with the Exchange Offer for the
Bonds described above, made untrue statements of material
fact or omitted to state material facts necessary in order
to make the statements made, in the light of the
circumstances under which they were made, not misleading,
or engaged in fraudulent, deceptive, or manipulative acts
or practices in violation of Section 14(e) of the Exchange

---

[1]   On October 22, 1999, as part of a comprehensive revision
to the rules applicable to takeovers, the Commission
redesignated Rule 10b-13 as Rule 14e-5.  Rule 14e-5 governs
tender offers that are announced after January 24, 2000.
Rule 10b-13 governs all cases where the tender offer was
announced before January 24, 2000, regardless of when the
prohibited activity occurred.  This action is against
DeSantis under Rule 10b-13 because all of the conduct at
issue in this case occurred before January 24, 2000.
Although Rule 10b-13 governs the conduct here, an
injunction would proscribe future violations of Rule 14e-5.

Act [15 U.S.C. §78n(e)], and DeSantis aided and abetted
AutoLend's primary violation pursuant to Section 20(e) of
the Exchange Act [15 U.S.C. section 78t(e)] by knowingly
providing substantial assistance thereto.

### SIXTH CLAIM FOR RELIEF

**(against DeSantis for Aiding and Abetting
Violations of Section 13(e) and Rule 13e-4(b)
of the Exchange Act)**

60.   Plaintiff SEC hereby incorporates paragraphs 1
through 59 with the same force and effect as if set out
here.

61.   In the manner described in paragraphs 1 through
60, AutoLend, as the issuer of a security registered
pursuant to Section 12 of the Exchange Act [15 U.S.C.
§78l], directly or indirectly, in connection with the
tender offer for the Bonds described above, purchased such
bonds by:  employing devices, schemes or artifices to
defraud; making untrue statements of material fact or
omitting to state material facts necessary in order to make
the statements made, in light of the circumstances under
which they were made, not misleading; or engaged in acts,
practices, or courses of business that operated as a fraud
or deceit on purchasers or sellers of the bonds, in
violation of Section 13(e) of the Exchange Act [15 U.S.C.
§78m(e)] and Rule 13e-4(b) promulgated thereunder [17

18

C.F.R. §240.13e-4],[2] and DeSantis aided and abetted

AutoLend's primary violations pursuant to Section 20(e) of

the Exchange Act [15 U.S.C. section 78t(e)] by knowingly

providing substantial assistance thereto.

### **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this

Court:

### I

Permanently enjoin DeSantis, his agents, servants,

employees, attorneys, and all persons in active concert or

participation with him who receive actual notice by

personal service or otherwise, from violating, directly or

indirectly, Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rules 10b-5 and 14e-5 (formerly Rule 10b-13)

[17 C.F.R. §§ 240.10b-5 and 240.14e-5], and aiding and

abetting violations of Sections 10(b), 13(a), 13(b)(2)(A),

13(e) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b),

78m(A), 78m(b)(2)(A), 78m(e) and 78n(e)] and Rules 10b-5,

12b-20, 13a-1, 13a-13 and 13e-4(j) (formerly Rule 13e-4(b))

promulgated thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20,

---

[2]   On October 22, 1999, as part of a comprehensive revision
to the rules applicable to takeovers, the Commission
redesignated Rule 13e-4(b) as Rule 13e-4(j), effective on
January 24, 2000.  Although Rule 13e-4(b) governs the
conduct here, an injunction would proscribe future
violations of Rule 13e-4(j).

240.13a-13 and 240.13e-4(j)], pursuant to Section 20(e) of the Exchange Act [15 U.S.C. Section 78t(e)].

## II

Permanently enjoin ITB, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it who receive actual notice by personal service or otherwise, from violating, directly or indirectly, Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(A), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20 and 13a-13 promulgated thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20 and 240.13a-13].

## III

Order DeSantis to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV

Enter an order prohibiting DeSantis from acting as an officer or director of any issuer required to file reports pursuant to Sections 12(b), 12(g) or 15(d) of the Exchange Act, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], as a result of his violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## V

Grant such other relief as this Court may deem just and proper.

Dated:   February 12, 2002

Of Counsel:

Paul A. Montoya
M. Gretchen Silver
Attorneys for Plaintiff
Securities and Exchange
Commission
500 W. Madison Street,
Suite 1400
Chicago, IL  60661-2511
(312) 353-7390

Thomas C. Newkirk
Cheryl J. Scarboro
Reid A. Muoio
Denise Y. Hansberry

Attorneys for Plaintiff
Securities and Exchange
Commission
450 Fifth Street, NW
Washington, DC 20549-0706
(202) 942-4546 (Hansberry)
(202) 942-9668 (fax)